ROSSITER v. NEW YORK PRESS CO., Limited.

(Supreme Court, Appellate Division, First Department.   December 30, 1910.)

1. LIBEL AND SLANDER (§ 19*)—LIBEL—WHAT CONSTITUTES.

In determining whether a publication is libelous, as charging criminal or disgraceful conduct, the test is whether the language used naturally conveys to the mind of an intelligent man a criminal or disgraceful charge.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 98, 99; Dec. Dig. § 19.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. **LIBEL AND SLANDER (§ 10\*)—LIBEL—CRIMINAL ACTS OR MISCONDUCT IN EM-PLOYMENT.**

    A publication stating that one received money from the city treasurer, or that his services as an expert witness for the city were not worth what he was paid, do not import a criminal or disgraceful charge, so as to be libelous on that ground.

    [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 41, 91–96; Dec. Dig. § 10.\*]

3. **LIBEL AND SLANDER (§ 10\*)—LIBEL—MISCONDUCT OR CRIMINAL ACTS IN EMPLOYMENT.**

    Defendant publishing company published an article relating to the discharge of certain persons employed by the city in building a waterworks system, which, when considered as a whole, was an attack upon the creation of useless places and the unnecessary employment for political purposes of men in building the water system, who were styled "henchmen"; the places created being designated "snap jobs," "graft jobs," "sinecures," and "soft snaps." The article stated that "the game" was controlled largely by upstate influences, and that "few city men got in on it," and that the "gang of sappers" came from places named in this state. The article further stated that five appraisers were employed on one section of the work at different salaries, but that two of them had proved efficient and were retained, that two others named were dropped, and did not state what became of the fifth, or refer in that connection to plaintiff, who was employed to give expert testimony for the state in the condemnation proceedings; but it stated thereafter that the man from Vermont drew a certain sum, and that there was "another by the name of R. [plaintiff], of New Jersey, who took from the city treasury $4,800 for his work," and that the reason for the employment of those two men from other states was not clear, and that the fact that men from almost every corner of the state, even from Vermont and New Jersey, had been drawing money from the board of water supply, indicated the carnival of graft that had been going on; but it did not state that plaintiff was one of the seven to nine "sinecurists" which the article stated were dropped from the city pay rolls. *Held*, that the publication did not charge that plaintiff was discharged by the city for incompetency or fraudulent conduct, even if it could be construed to state that he was removed from a "sinecure."

    [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 41, 91–96; Dec. Dig. § 10.\*]

4. **LIBEL AND SLANDER (§ 10\*)—PUBLICATIONS LIBELOUS—CONSTRUCTIONS.**

    The publication did not charge plaintiff with a conspiracy with others to cheat and defraud the city.

    [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 41, 91–96; Dec. Dig. § 10.\*]

5. **LIBEL AND SLANDER (§ 123\*)—ACTIONS—JURY QUESTION.**

    If an alleged libelous publication is subject to the construction of charging criminal or disgraceful conduct, so as to be libelous per se, the question of its meaning should be submitted to the jury.

    [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 357–359; Dec. Dig. § 123.\*]

6. **LIBEL AND SLANDER (§ 86\*)—LIBEL—COMPLAINT—SUFFICIENCY.**

    Though the innuendo be not justified by the libelous article alleged, the complaint may be good, if the article is susceptible of any libelous meaning.

    [Ed. Note.—For other cases, see Libel and Slander, Cent, Dig. §§ 205–208; Dec. Dig. § 86.\*]

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

7. LIBEL AND SLANDER (§ 97*)—LIBEL—SUFFICIENCY OF COMPLAINT.
    While the complaint in libel is not enlarged by annexing the alleged
libelous publication thereto, it is demurrable if the publication annexed
shows that the libelous charges alleged were not in fact made.
    [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 234–
236; Dec. Dig. § 97.*]
    Clarke, J., dissenting.

Appeal from Special Term, New York County.

Action by Richard Rossiter against the New York Press Company,
Limited. From an interlocutory judgment overruling a demurrer to
the complaint, defendant appeals. Reversed, and demurrer sustained,
with leave to plead over.

The alleged libelous article is as follows:

"Conners Hard Hit About Water Graft.

"Henchmen are Dropped from Snap Catskill Jobs.

"Many More are to Go.

"Almost $1,000,000 a Year will be Saved to City by Watson's Pruning.

"The Democratic state machine got a jolt yesterday through Mayor Gaynor,
and, though State Chairman "Fingy" Conners, who is fighting for his political
life, was hard hit, there is said to be no political significance in the dropping
of seven of his friends from graft jobs under the Board of Water Supply, the
commission building the Catskill water system. Conners, as State Chairman,
was able to get places for his counsel, George B. Dolson, of Syracuse, at $50
a day, and his secretary, John T. Mahar, of Albany, as a clerk at $200 a
month. Both men were among seventy-nine sinecurists dropped off the pay
roll yesterday by Corporation Counsel Watson in compliance with the letter
of Mayor Gaynor last week directing that he take steps to cut down the ex-
penses of the construction of the $161,000,000 water system.

"Other victims of the pruning knife, wielded under the direction of the
Mayor, include Jacob A. Newstead, Republican leader of the Fourth Assembly
District, Manhattan, who was getting $20 a day as an appraiser; E. T. Wil-
liams, of Niagara Falls, Stephen Ryan, of Norwich, George B. Van Valden-
berg, of Catskill, and Wesley J. Springstead, of Haverstraw, all members of
the Democratic State Committee, placed by Conners. The removal of these
men, coming as it does when Conners is pressed to the wall by his foes in the
fight to take from him the chairmanship of the State Committee, has no rela-
tion to the political situation, and is nothing more than a part of the Mayor's
purpose to cut out the graft from the Catskill water project.

"There will be almost $1,000,000 a year saved by the operation when the
final cutting is made. There are about fifty-eight soft snaps to be cut out yet,
and more than half of them will be wiped out before another two weeks.

"Corporation Counsel Watson said last night he expected to drop eight more
men this week, and probably twenty next week. These men would all be
dropped now but for the fact they are all testifying in condemnation proceed-
ings as appraisers, and it is not expedient to cut them off now. The graft
jobs in the Catskill water system have been appalling and are growing worse
for two years, but Mayor Gaynor determined to kill them, and the work only
has begun. The fact that men from almost every corner of the state, even
from Vermont and New Jersey, have been drawing money from the Board
of Water Supply, indicates the carnival of graft that had been going on under
the McClellan administration.

"Few New York City men got in on it, as the game appears to have been
controlled largely by upstate influences. The seventy-nine men dropped yes-
terday were rated as appraisers of real estate, of water power, of buildings or
of quarries. None of them has any special qualifications for the work except
the political backing.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"The secretary of "Fingy" Conners, Mahar, received $200 a month, but it is not shown he ever got closer to the Ashokan Dam than Albany. It was said the members of the Democratic State Committee named and Jacob A. Newstead, Republican leader of the Fourth Assembly District, Manhattan, never bothered about going near the waterworks, but they collected fees. Although Corporation Counsel Watson was not willing to go into details as to the salary graft, he gave as a sample of the system, saying there were five appraisers of water power and quarries on one section along the aqueduct, three of whom were paid $50 a day and the others $20 and $10. Why there should be five "experts" receiving different salaries is one of the curious phases of the case.

"Corporation Counsel Watson kept one of the $50 men and the $20 man, because he did not think it good policy to drop all of them out, inasmuch as the two men retained had proved their efficiency. One of the men dropped is Peter C. Nostrand, of Manhattan, who drew $19,000, and the other is Walter. S. Morton, also of this city, who drew $22,800. There was a man from Proctor, Vt., C. W. Maynard, who drew $6,300, and another by the name of Richard Rossiter, of Paterson, N. J., who took from the city treasury $4,800, for his work. The reason for the appointment of these two men from other states is not clear, and the Corporation Counsel had no information on the subject.

"The Catskill region and the Sullivan county and Ulster county sections naturally benefited most by the graft on the city. The gang of sappers of New York City taxpayers' money was drawn from' Buffalo, Schenectady, Oswego, Rochester, Yonkers, Saugerties, Kingston, Cold Spring, Otisville, and a score of villages in the Catskill region. Throughout the last three years of the McClellan administration the 'hayseeds' had been feeding on the city treasury without hindrance.

"The exposure of this graft is only beginning, for there are jobs passed upon by the upstate courts that are to be eliminated in the same way which Mayor Gaynor is working out. Corporation Counsel Watson said he had taken steps to organize the work by placing William McMurtrie Speer, lawyer, of No. 157 Broadway, at the head of a staff organized in this borough, but of activities unconfined, to direct the work in future.

"It was directed by the Mayor in his letter to the Corporation Counsel that the advertisements of the various condemnation proceedings be limited to the smallest number of newspapers possible.

"In reply to this the Corporation Counsel says he has taken steps to cut off the expense in that direction. It had been the practice to spend money recklessly in handing out advertisements to small papers in the various counties along the line of the aqueduct, for which the taxpayers of this city have paid. "To compel the Condemnation Commissioners to sit a full day for every day they charge the city $50, the Corporation Counsel says he has instituted a time record system according to which it must be shown why each session has been adjourned in the stenographer's minutes. Watson expects this will stop the practice of charging for a full day's work for a session of one hour or less. The joke the upstaters have had on the city for three years is about ended, and when Mayor Gaynor is in office the work of acquiring property on the line of the aqueduct will be conducted at a minimum of expense."

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, MILLER, and DOWLING, JJ.

Cornelius J. Sullivan, for appellant.
Stuart G. Gibboney, for respondent.

MILLER, J. The plaintiff complains that the defendant falsely charged him (1) with having obtained $4,800 from the treasury of the city of New York; (2) with having rendered insufficient services for money paid to him for expert testimony which he had given in various condemnation proceedings; (3) with having been in a conspiracy with others to cheat and defraud the taxpayers of the city of New York; (4) with having been discharged from his employment as an expert

on land values from the service of the city of New York by reason
of his incompetency in his said profession, and also for fraudulent con-
duct.

A copy of the alleged libelous article is annexed to the complaint, so
we may look to it to see whether the plaintiff's construction is justified.
In determining whether an article is libelous, the test is whether to the
mind of an intelligent man the tenor of the article and the language
used naturally import a criminal or disgraceful charge. Church v.
Tribune Association, 135 App. Div. 30, 119 N. Y. Supp. 885; More
v. Bennett, 48 N. Y. 472.

It certainly does not import anything criminal or disgraceful to
charge that a man has received money from the city treasury, or that
his services as an expert witness were not worth what he was paid.
The first two charges, as above subdivided, may therefore be elimi-
nated.

I can find no warrant for the assertion that the article charged the
plaintiff with having been discharged for incompetency or fraudulent
conduct. The only reference to him is found in the paragraph relat-
ing to the five appraisers on one section who received different salaries.
But there can be no inference that he was one of them, because it is
stated that two, who had proved their efficiency, were retained, that
one of the men dropped was N., and that the other was M. What
happened to the fifth is not stated. The article then proceeds:

"There was a man from Proctor, Vt., C. W. Maynard, who drew $6,300, and
another by the name of Richard Rossiter, of Paterson, N. J., who took from
the city treasury $4,800, for his work. The reason for the appointment of
these two men from other states is not clear, and the Corporation Counsel
had no information on the subject."

It is not stated when the plaintiff took the $4,800 for his work,
whether he still was employed by the city when the alleged exposure
of graft was made, or that he was ever discharged, much less that he
was discharged for fraud or incompetence. In the first part of the
articles, it is said that 79 sinecurists were dropped off the pay roll;
but it is nowhere stated, or even intimated, that the plaintiff was one
of them. Even if it be assumed that the article charges him with hav-
ing been removed from a sinecure, that is far from charging that the
removal was for fraud or incompetence. Sinecures in one form or an-
other have probably existed as long as organized society; but it has
never been held, so far as we are aware, that the charge of holding
or being removed from a sinecure imports a charge of fraud or incom-
petence. If the word "took" might otherwise have had a sinister
meaning, that meaning is plainly negatived by the words "for his work"
at the end of the sentence. The fourth charge may therefore be elim-
inated as not being justified; and the third alone remains to be con-
sidered.

The assertion that the article charges the plaintiff with being in a
conspiracy with others to cheat and defraud the city seems to me al-
together too farfetched. The article as a whole is an attack upon the
creation of useless places and the unnecessary employment for politi-
cal purposes of men styled "henchmen" in connection with the build-

ing of the Catskill water system. Those places are styled "snap jobs," "graft jobs," "sinecures," "soft snaps." But so far as there is any suggestion of conspiracy in the article, if there be such a suggestion, it unmistakably refers to residents of this state, mostly upstate politicians; as it is said that "the game" was controlled largely by upstate influences, that "few city men got in on it," that the "gang of sappers" was drawn from the places mentioned in this state, thus plainly ·negativing any inference that the man from Vermont and the plaintiff were ·either "henchmen" or members of the "gang of sappers." They are referred to only incidentally in the course of the article, and the only point in referring to them, as plainly appears from the article, is the ·circumstance that they reside outside the state, wherefore it was said that the reason of their appointment was not clear.

The reference to ·the plaintiff is characterized somewhat by the following:

"The fact that men from almost every corner of the state, even from Vermont and New Jersey, have been drawing money from the Board of Water Supply, indicates the carnival of graft that has been going on. * * * "

It may be that that implies that the employment of the plaintiff was ·unnecessary, and even that his position was a sinecure, though the article distinctly states that the money taken by him was "for his work," which certainly implies that he did something to earn it. The word "graft" is flexible, and may mean a variety of things. Its meaning in this article is unmistakable, as it plainly refers to the salary paid the so-called "sinecurists." It may be arguable that the article charges the plaintiff with being one of a large number of unnecessary employés of the board of water supply, whose positions were practically sinecures; but that does not import a charge of a conspiracy to cheat and defraud.

Of course, if the plaintiff's construction is permissible, the question is for the jury. Morrison v. Smith, 177 N. Y. 366, 69 N. E. 725. But we are unable to find any basis whatever for it. It is to be observed that the article is not pleaded with innuendo, in which case, even though the innuendo be not justified, the complaint may be sustained, if the article is susceptible of any libelous meaning. The plaintiff has seen fit distinctly to plead what he complains of, and to annex the libelous article to his complaint. He does not thereby enlarge his complaint; but he made it demurrable if, upon reference to the article, it appears that the charges complained of by him were not in fact made. It is unnecessary, therefore, to search the article for any libelous meaning not complained of.

I do not suggest that such meaning can be found, for I think that ·the worst view of the article, so far as 'the plaintiff is concerned, is that it charges him, as he alleges, "with having rendered insufficient service for money paid to him for expert testimony," which he has given in various condemnation proceedings. He states in his complaint that he had been engaged in the business of purchasing lands for reservoir purposes, mountainous, forest, and otherwise, and by reason thereof had become acquainted with the values thereof, and had at various times been called to testify in various legal proceed-

ings as an expert on values of such property. As already said, that charge does not import anything disgraceful or criminal.

The interlocutory judgment should be reversed, with costs, and the demurrer sustained, with costs, with leave to the respondent to plead over on payment of costs.

INGRAHAM, P. J., and SCOTT and DOWLING, JJ., concur. CLARKE, J., dissents.